UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Mariah J. Gage**

      **v.**                                        Case No. 14-cv-480-PB
                                                Opinion No. 2016 DNH 038
**Rymes Heating Oils, Inc.**

**MEMORANDUM AND ORDER**

Mariah J. Gage sued her former employer, Rymes Heating
Oils, Inc., alleging that Rymes violated both the Americans with
Disabilities Act ("ADA") and New Hampshire's Law Against
Discrimination by demoting and firing her on the basis of her
disability, an episodic migraine condition.  She also claims
that Rymes wrongfully discharged her in violation of New
Hampshire law.  Rymes has responded with a motion for summary
judgment.

**I.   BACKGROUND**

Gage worked at Rymes for approximately nine months, from
September 2012 until June 25, 2013.  Rymes hired Gage to work as
a receptionist at the company's Pembroke, NH office, where her
responsibilities included greeting and assisting customers,
scanning and filing documents, and running various errands
outside the office.  Gage's immediate supervisor at Rymes was
Megan Enright.

At the outset of her employment, Gage signed a document outlining the company's personal and sick time policy.  Doc. No. 12-3.  That document detailed how Rymes employees accrued, and were required to use, paid vacation and "personal time," which employees could use for "temporary absence due to appointments, illness or injuries."  Id. at 3.  Employees accrued vacation and personal time on a weekly basis.  After a ninety-day probationary period, full-time employees were entitled to ten vacation days per year, accrued at a rate of 1.5396 hours per week, plus six paid personal days, accrued at a rate of .93 hours per week.  In addition, Rymes gave all of its full-time employees eight hours of unpaid personal time.  The policy provided that, "[i]n the event an employee exceeds the limits outlined in this document an employee will be terminated immediately."  Id. at 3.

Rymes' operations manager, Charles Cosseboom, was responsible for hiring and firing decisions at Rymes.  As Cosseboom explained during his deposition, Rymes did not always fire an employee who missed work without previously accruing sufficient personal time.  See Doc. No. 14-3 at 4.  Cosseboom stated, however, that Rymes did not have any "written guideline[s]" regarding whether an employee would be fired for excessive absenteeism.  Id.

From the beginning of her employment through June 11, 2013, Gage had fourteen unexcused absences, where she either arrived to work late, left work early, or missed work for an entire day without having accrued the necessary personal time.  Doc. No. 12-5 at 2.  Neither party has provided a detailed explanation for these absences.  At her deposition, however, Gage stated that she missed work for several reasons, including to care for her son when he was ill, to attend family court proceedings, and to travel to visit her boyfriend in another state.[1]  Doc. No. 14-2 at 6.

Gage also missed work due to her own illnesses.  On March 27 and 28, 2013, she was out due to a flu-like illness.  According to Gage, she was stricken with "a virus" on March 27, and "suffered uncontrollable bouts of nausea on March 27, 2013 and the following day."  Doc. No. 14-4 at 1.  Gage visited her

---

[1] The record also contains a note from Concord Pediatrics certifying that Gage was absent from work on October 19, 2012, and would be absent again on October 22, to bring her son to the doctor.  Doc. No. 14-7 at 32.  In addition, the record contains four Rymes "employee requests for vacation/personal time payout" forms.  Id. at 28-31.  These documents suggest that Gage requested, and her supervisor approved, 8.5 hours off on April 5, 2013 for an unspecified reason; 4.5 hours off on April 8, 2013, apparently for an appointment for her son; four hours off on June 5, 2013, apparently for her son's surgery; and eight hours off on July 18, 2013 for an unspecified reason.  Id. During the deposition of Gage's former supervisor, Megan Enright, Gage's counsel asked Enright about several of Gage's specific absences.  Id. at 13-14.  Enright stated that she could not recall why Gage left early or arrived late on the specific dates discussed.  Id.

doctor on March 27, who wrote a note stating "[p]lease excuse [Gage] from work today, March 27, 2013 and March 28, 2013, for legitimate medical reasons.  If you have any questions, please call."  Doc. No. 14-7 at 27 (doctor's note).

Gage returned to work on March 29, 2013 and gave the doctor's note to her supervisor, Megan Enright, and to HR Generalist Dean Tremblay.  That same day, Enright and Tremblay met with Gage to discuss her absences.  During the meeting, Enright and Tremblay reminded Gage of the company's attendance policy, and told her that her job was in jeopardy because she had been absent without the appropriate personal time accrued. Doc. No. 14-4 at 1-2.  Gage further recalls that, during that meeting, Tremblay "specifically warned [her] that the next time [she] missed work for any reason [she] would be terminated." Id. at 2.

On April 1, 2013, several days after Gage missed work due to her "flu like" illness, Gage and Enright discussed Gage's health condition via instant message.  Enright asked Gage whether she was feeling better, and Gage responded that she had "a massive migraine right now, slightly queasy stomach but over all not bad, I think I have a sinus coming AGAIN."  Doc. No. 14-7 at 35 (emphasis in original).

Gage had no additional unexcused absences until June 12, 2013.  That morning, Gage awoke at approximately 5:30 a.m. with

4

a severe right-sided headache and numbness on the left side of her body.  Doc. No. 14-4 at 2.  She was unable to dress herself, unable to "compose a text [message to a coworker describing her symptoms] that made any sense," and was unable to "find words" when trying to speak with her mother, Debra Gage.  Id.   Fearing that Gage was having a stroke, Gage's mother called 911.  Gage was taken by ambulance to Concord Hospital for treatment.  Id.; Doc. No. 14-6 at 1.

At about 6:30 or 7:00 a.m. on June 12, Debra Gage called HR Generalist Tremblay, and left a voicemail explaining that Gage would not be at work that day, that she "believed that [Gage] was suffering a stroke, and that an ambulance had just taken [Gage] to Concord Hospital."  Doc. No. 14-6 at 1.  When Tremblay did not return Ms. Gage's call, Ms. Gage called Rymes again later in the day.  The person who answered her call responded that Tremblay was not available "but that [her] message had been received."  Id.

An emergency room report memorializes Gage's treatment at Concord Hospital.  The report describes Gage as a "23-year-old female with a history of chronic migraines" and a family history of migraines.  Doc. No. 12-4 at 2.  According to the report, Gage explained her condition as "her typical headache," but that she had never before "had the other symptoms," namely the numbness and cognitive impairments, alongside her headache.  Id.

The doctor notes that he had "a long conversation with [Gage and Gage's mother] about the suspicion that [her condition] represents a complex migraine and not a TIA [transient ischemic attack] or stroke."  Id. at 3.  The report further indicates that the doctor did "not think this represents a TIA."  Id.

Instead, the doctor diagnosed Gage with a "[c]omplex migraine," which had likely been exacerbated by Gage's new birth control medication.  Id. at 3-4.  The doctor recommended "close follow up with the primary care in the next 24 hours" and out-patient MRI and MRA imaging.  Id.  The doctor also recommended that Gage see a headache specialist "as she clearly states to me that she gets headaches on a regular basis going back to an early age of 8 with a strong family history."  Id. at 4.  The report, which the doctor signed electronically at 11:15 that morning, indicates that Gage's symptoms had "completely resolved."  Id. at 3.

Meanwhile, also on June 12, several of Gage's co-workers discussed her condition via instant message.  At 1:05 that afternoon, Enright sent a message to her immediate supervisor, Megan Wilson, stating that Enright was "super annoyed with the whole [Gage] thing."  Doc. No. 14-7 at 43.  Wilson responded that she had "already made [operations manager Cosseboom] aware" and said that "it was just a matter of time . . . ."  Id. Enright replied that she knew that Gage was not "feeling good on

Monday and she had to go to the doctor's [M]onday night because
they thought she had a blood clot, then she was taken by
ambulance last night or this morning, [I] would really like to
know why the hell she couldn't call in herself." Id. at 43.
Several minutes later, Enright told Wilson that she had "just
talked to [Gage's friend and co-worker Crystal Rockwell, who]
said that they think that [Gage] had a stroke, she was sluring
[sic] her words this morning and every [sic] confused and
couldn't form a sentence.  She is in the [emergency room] and
they are running test[s] to see what is going on." Id.

        Later that afternoon, Enright, Wilson, Cosseboom, and
Tremblay decided to "have a talk" with Gage when she returned to
work.  Id. at 7.  Gage's superiors considered firing her
following her June 12 absence, but instead decided to move her
to a different desk in the office and to take away some of her
previous job tasks.  Id. at 8.

        In describing this decision, Enright explained that Gage's
superiors "felt at that time that she was not able to sit up at
the front receptionist desk as . . . her attendance wasn't there
to help walk in customers, which was what [Rymes] really
needed." Id.  Enright said that Cosseboom "simply moved [Gage]
away from the front desk so she didn't have to help walk in
customers, as she constantly had migraines, and she was never
there to help walk in customers." Id. at 9.  Following June 12,

Gage kept her same pay rate and "all the same benefits," as well as "the same job duties as she was doing [before] minus helping walk the customers or driving to the bank or the Post Office." Id.

Gage returned to work on June 13, 2013, the day after her hospitalization.  That morning, Enright asked Gage about the June 12 incident via instant message, writing "[h]ey, we never got in touch with your mom yesterday, what's going on?"  Id. at 36.  Gage responded "transient [i]schemic attack (mini stroke)," but said that she was "alright though, just have to have an MRA and stuff done."[2]  Id.  Gage also gave a doctor's note to Tremblay.

That same day, Enright and Tremblay again met with Gage to discuss her absences.  According to Gage's version of that conversation, Tremblay "did not ask [her] anything about [her] condition and instead just told [her] that he was demoting [her] from [the] receptionist position."  Doc. No. 14-4 at 2. According to Tremblay's summary of that same meeting, Enright and Tremblay told Gage that her job was in jeopardy because of her absences, and said that Gage would be moved to a different desk, and would no longer greet customers or run errands.

---

[2] A magnetic resonance angiogram, or MRA, is a noninvasive test that is used in evaluating the blood vessels in a patient's brain and neck.

Gage reports that she was "humiliated" and "saddened by the loss of job responsibilities." Doc. No. 14-4 at 3. A number of Gage's coworkers apparently noticed the change too. In a June 21, 2013 instant message exchange, Wilson told Enright that "so far 3 people have asked [Gage] why she is back here," to which Enright responded, "good! Must be embarrassing for her." Doc. No. 14-7 at 46. In that same conversation, Enright told Wilson that she was "dieing [sic] to catch [Gage] on her cell phone or online so we can just send her home." Id.

The final incident preceding Gage's termination allegedly occurred on June 24, 2013, although the parties dispute what happened that day. According to Tremblay, another Rymes employee told Tremblay that Gage was crying in the basement of Rymes' office building.[3] Enright then went to the basement to look for Gage, but could not find her there or anywhere else in the building. Doc. No. 14-8 at 11. Tremblay then went into the basement himself and looked around, but was similarly unable to find Gage. Tremblay reported that Gage "was nowhere to be found for 30 minutes." Id.

---

[3] This apparently was not the first time that Gage was found crying in the basement. In a June 21, 2013 instant message conversation, Enright told Tremblay that Gage "is at the filing cabinets now . . . I just went down stairs and she was filing. She isn't crying anymore but I asked why she was cring [sic] and she said that she just has a wicked headache." Doc. No. 14-7 at 39.

Gage disputes this account.  She reports that she was filing documents in the basement on June 24, and was "suddenly overcome with emotion" because she "felt as though [she] was walking on eggshells at Rymes and that the company was going to fire me the first chance it got."  Doc. No. 14-4 at 3.  Gage claims that both "Ms. Enright, and later Mr. Tremblay, came down to the basement where [she] was filing" documents, and Gage states that she "separately spoke with each of them."  Id.  Gage contends that she "never went missing from the Rymes building on June 24, 2013, nor did anyone . . . ever question [her] about supposedly having been absent from the workplace" that day.  Id.

Following Gage's alleged thirty-minute absence from the Rymes offices on June 24, Tremblay consulted with Cosseboom, and Cosseboom decided to fire Gage.  The next day, June 25, Enright and Tremblay told Gage that her employment had been terminated. Rymes reports that it fired Gage "for performance issues and attendance issues," Doc. No. 14-7 at 49, though Cosseboom stated at his deposition that Gage's attendance was "the primary reason" for her firing.[4]  Doc. No. 14-3 at 7.  More specifically, at Cosseboom's deposition, Gage's counsel asked, "under Rymes' strict attendance policy, [does it] matter what the reason was

---

[4] For the purposes of its summary judgment motion, Rymes assumes that Gage's absences were the sole reason for her firing.  Doc. No. 16 at 6 n.2.

for her absence on June 12[?]"  Id.  Cosseboom responded that
"[t]he last [absence] is always the one that's the problem, but
the ones before that, there wasn't an individual event with
[Gage], one absenteeism."  Id.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and [that] the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  The evidence submitted in support of the motion must be
considered in the light most favorable to the nonmoving party,
drawing all reasonable inferences in its favor.  <u>See</u> Navarro v.
Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the
absence of any genuine dispute of material fact.  Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  A material fact "is one
'that might affect the outcome of the suit under the governing
law.'" United States v. One Parcel of Real Prop. with Bldgs.,
960 F.2d 200, 204 (1st Cir.1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the moving party
satisfies this burden, the nonmoving party must then "produce
evidence on which a reasonable finder of fact, under the
appropriate proof burden, could base a verdict for it; if that
party cannot produce such evidence, the motion must be granted."

Ayala—Gerena v. Bristol Myers—Squibb Co., 95 F.3d 86, 94 (1st
Cir.1996); see Celotex, 477 U.S. at 323.


### III.  ANALYSIS

Gage has brought three claims against Rymes.  She first
alleges that she suffered a disability – an episodic migraine
condition – while she was employed at Rymes, and claims that
Rymes violated both the ADA (Count I) and Section 354-A of the
New Hampshire Revised Statutes Annotated (Count II) by (1)
"demoting" and ultimately firing her on the basis of her
disability, and (2) otherwise failing to accommodate her
disability.  In Count III, Gage asserts that her firing also
constituted a wrongful discharge under New Hampshire law.

Rymes presents various challenges to Gage's claims.  It
argues that Gage's ADA and Section 354-A claims fail because she
did not suffer from a "disability," as defined by the ADA and
Section 354-A.  It further contends that, even assuming that
Gage had such a disability, summary judgment is appropriate on
Counts I and II because (1) any adverse employment action
against Gage was a result of her excessive absenteeism rather
than her disability, and (2) Gage never requested an
accommodation for her disability.  Rymes also asserts that
Gage's wrongful discharge claim fails because Gage cannot show
either that her termination was motivated by bad faith,

retaliation, or malice, or that she was fired for performing an act encouraged by public policy.  I address each argument below.

**A.   Disability Claims[5]**

   1.  Disability

Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  A plaintiff can bring two types of ADA claims: a so-called "accommodation claim" and a "discrimination claim." To make out a viable "accommodation claim," a plaintiff must show that "(1) [she] is disabled within the meaning of the ADA, (2) [she] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [her] employer], despite knowing of [her] disability, did not reasonably accommodate it." Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).  To survive summary judgment on a "discrimination claim," a plaintiff must present sufficient evidence for a reasonable juror to find "(1) that [she] was 'disabled' within the meaning of the ADA; (2) that [she] was

---

[5] Gage has brought virtually identical claims pursuant to both the ADA (Count I) and Section 354-A (Count II).  As both this court and the New Hampshire Supreme Court have recognized, claims under Section 354-A are construed in conformity with the ADA.  See Montemerlo v. Goffstown Sch. Dist., SAU No. 19, 2013 DNH 134, 13-14.  Accordingly, and as both Rymes and Gage agree, the parties' arguments regarding Gage's Section 354-A claim rise and fall on the same bases as their ADA arguments.  See Doc. Nos. 12-1 at 15; 14-1 at 13 n.3.  My analysis of Gage's ADA claim therefore applies equally to Gage's Section 354-A claim.

able to perform the essential functions of [her] job with or without accommodation; and (3) that [she] was discharged or adversely affected, in whole or in part, because of [her] disability."  See Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 34 (1st Cir. 2009).  Thus, both a discrimination claim and an accommodation claim require proof that the plaintiff was "disabled" within the meaning of the ADA.

The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  Here, Gage proceeds primarily under the first ("actual disability") category of the disability definition.[6]

Gage argues that she is disabled because she suffers from disabling episodic migraine headaches.  Rhymes responds by first claiming that Gage waived her episodic migraine claim because she disavowed any such claim during her deposition.  In the

---

[6] Gage does not assert that she was "regarded as" being disabled pursuant to 42 U.S.C. § 12102(1)(C).  She does argue, however, that she had a "record of" disability when she was fired.  Doc. No. 14-1 at 21-22.  This argument consists almost exclusively of Gage stating that she "had a record of receiving emergency room treatment on June 12, 2013 . . . ."  Id.  Because Gage did not develop this secondary argument, and because it ultimately has no impact on Rymes' motion, I do not address her claim in detail.

alternative, it argues that the evidence Gage points to in support of her claim is simply insufficient to satisfy her burden of proof on the issue.  I begin with Rymes's waiver argument.

### a.  Waiver

Gage alleged in her complaint that she is disabled in part because she "suffers from migraine headaches that substantially limit her in major life activities."  Doc. No. 1 at 4.  During her deposition, however, Gage engaged in the following exchange with Rymes' attorney:

```
Q:   [Y]our lawsuit . . . alleges that you suffer from
     a disability; is that right?
A:   At the time, yes.
Q:   Okay.  And that disability was migraines?
A:   I had a stroke.
Q:   And the stroke was your disability?
A:   That day, yes.
Q:   Okay. Did you have any other disability during
     your course of your employment at Rymes?
A:   No.
```

Doc. No. 14-2 at 4.  Rymes argues that this exchange effectively waived any claim that Gage suffers from disabling migraine headaches.

Rymes bases its waiver argument on decisions from other jurisdictions in which courts have ruled that a plaintiff's deposition testimony waived a cause of action or theory of liability asserted in the plaintiff's complaint.  See, e.g., Buenrostro v. Potter, 176 F. App'x 828, 829 (9th Cir. 2006);

Johnson v. E.A. Miller, Inc., 172 F.3d 62 (10th Cir. 1999);
Butler v. Exxon Mobile Corp., 838 F. Supp. 2d 473, 486 (M.D. La.
2012).  The First Circuit has not adopted such a rule, however,
and I decline to do so here.

Rymes finds no support for its waiver argument in either
the rules of civil procedure or the rules of evidence.  Although
the rules of civil procedure specify that an admission made in
response to a request for admission under Fed. R. Civ. P. 36
conclusively establishes the fact admitted, the rules governing
depositions do not give similar effect to deposition testimony.
Further, the applicable rule of evidence, Fed. R. Evid.
801(d)(2), is flatly inconsistent with Rymes' argument as it
treats a party opponent's statement in a deposition as an
"evidentiary admission," which may be offered in evidence by an
adversary without preventing the deponent from later introducing
other evidence that explains or contradicts the admission.  See
Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).

I am reluctant to treat an evidentiary admission in a
deposition as the functional equivalent of an admission under
Rule 36.  Few deponents are trained lawyers.  Litigants do not
necessarily understand the legal theories on which their claims
are based.  They make honest mistakes, forget pertinent facts,
and misunderstand the significance of the questions being asked.
See Weiss v. Union Cent. Life Ins. Co., 28 F. App'x 87, 89 (2d

Cir. 2002); Guadagno v. Wallack Ader Levithan Assocs., 950 F.
Supp. 1258, 1261 (S.D.N.Y. 1997).  In the interests of fairness,
then, a party should ordinarily be allowed to explain or
controvert an admission made during a deposition.  See Lee v.
Smith & Wesson Corp., 760 F.3d 523, 528 (6th Cir. 2014).

Here, pursuant to this general rule, it is appropriate to
treat Gage's deposition testimony as an evidentiary admission.
At the deposition, Rymes counsel asked Gage to describe her
"disability," Doc. No. 14-2 at 4, a question that required Gage,
a lay-person, to understand both her medical condition, and the
legal definition of "disability."  Gage's response – that her
only "disability" was a "stroke" on June 12 – was inconsistent
with both the disability pled in her complaint (migraine), and
her June 12 diagnosis (complex migraine).  Under these
circumstances, it would be inequitable to treat Gage's testimony
as a binding admission.  See Lee, 760 F.3d at 528 ("A tort
plaintiff should be able to testify honestly to his memory of
what happened and still have his lawyer argue that on the
evidence as a whole it is more probable than not that the memory
was faulty.").[7]

---

[7] Rymes is also off base in claiming that this issue is governed
by the so-called "sham affidavit" rule.  According to this rule,
"[w]hen an interested witness has given clear answers to
unambiguous questions, [s]he cannot create a conflict and resist
summary judgment with an affidavit that is clearly
contradictory, but does not give a satisfactory explanation of

I accordingly reject Rymes' argument that Gage's deposition testimony prevents her from arguing that her episodic migraine condition constituted a disability under the ADA.[8]

### b. Sufficiency

Gage asserts that she was actually disabled when she worked for Rymes due to an episodic migraine condition, and that her June 12, 2013 complex migraine[9] was a severe manifestation of

---

why the testimony is changed." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).  The rule thus allows courts, under appropriate circumstances, to ignore an affidavit that was produced solely to defeat summary judgment. That rule is inapposite here, however, because Gage does not rely upon a self-serving affidavit to oppose Rymes' motion for summary judgment.  Instead, as explained below, Gage cites other evidence - medical records, instant message exchanges, and others' deposition testimony - to show that she in fact suffered from chronic migraines.  The sham affidavit rule therefore does not bar Gage from advancing an evidentiary theory that is inconsistent with her deposition testimony.

[8] Rymes attempts to bolster its waiver argument by pointing to the fact that Gage waited until her surreply memorandum to present her episodic migraine argument.  Although there is precedent at the appellate level for the proposition that an argument that is not presented in an opening brief is waived, see, e.g., North American Specialty Ins. Co., 258 F.3d 35, 45 (1st Cir. 2001), Rymes does not cite to this case law or otherwise explain how such a rule should be applied in the trial courts.  Because this argument has not been properly developed as a distinct basis for the relief Rymes seeks, I decline to consider it.

[9] At various times, including in her briefs, Gage has suggested that she suffered a transient ischemic attack or "mini stroke" or "stroke" on June 12.  See Doc. Nos. 14-1 at 14; 14-2 at 4; 14-7 at 36.  There is, however, no medical evidence in the record to support her claim.  Instead, Gage was actually diagnosed with a complex migraine, and the emergency report repeatedly indicates that the doctor did "not think [Gage's

that condition.  The ADAAA provides that "[a]n impairment that
is episodic or in remission is a disability if it would
substantially limit a major life activity when active."  42
U.S.C. § 12102(4)(D).  Courts must consider whether an episodic
impairment substantially limits a plaintiff's major life
activities "without regard to the ameliorative effects of
mitigating measures," such as medication.  Id. at § 12102(4)(E);
see 29 C.F.R. § 1630.2(j)(1)(vi).  Here, Gage argues that, when
active and unmitigated, her migraine condition substantially
limits her major life activities of "feel[ing]," "speak[ing],"
and "communicat[ing]."  Doc. No. 20 at 2.

In response, Rymes does not dispute that, in some
circumstances, an episodic migraine impairment could constitute
a disability.  Instead it argues that Gage has proffered
insufficient evidence to show either that she actually suffered
from migraines, or that her condition substantially limited her
with respect to major life activities.  For the reasons set
forth below, Gage has provided minimally sufficient evidence to
support her episodic migraine claim.

First, there is enough evidence for a reasonable juror to
find that Gage actually suffered from a migraine condition.
That evidence includes Gage's June 12, 2013 "chronic migraine"

---

condition] represents a TIA."  Doc. No. 12-4 at 2.  I therefore
refer to Gage's June 12 impairment as a migraine.

diagnosis, and her statements, recorded in the June 12 hospital report, that she had experienced migraines on a "regular basis" since age eight.  Doc. No. 12-4.  Megan Enright's statements, including her reference in an instant message exchange to Gage having a "wicked headache" on June 21, 2013, and her deposition testimony that Gage "constantly had migraines," substantiate Gage's claim.  See Doc. No. 14-7 at 9, 39.

Second, there is also sufficient evidence to support Gage's contention that her migraine condition substantially limited her major life activities of "feel[ing]," "speak[ing]," and "communicat[ing]" when active.  Doc. No. 20 at 2.  That evidence again largely consists of Gage's comments regarding her June 12 migraine, which produced numbness and cognitive impairments.  See Doc. Nos. 12-4; 14-4.  And, again, Enright's deposition testimony that Gage "constantly had migraines, and . . . was never [at the reception desk] to help walk in customers" arguably corroborates Gage's claim that her migraine condition was substantially limiting when active.

This evidence is undoubtedly thin.  There is no evidence, for example, that Gage's migraines were as debilitating on any other occasion as during her June 12 episode - the evidence in fact suggests that her June 12 migraine was unusually serious.  Moreover, Gage has not provided medical evidence, or even her own affidavit, describing the frequency or intensity of her

headaches.  Nonetheless, the ADAAA and accompanying regulations demand a generous view of Gage's proffer.  The substantial limitation standard "is not meant to be . . . demanding," and a plaintiff "usually will not [be required to produce] scientific, medical, or statistical analysis" to show that her impairment imposes a substantial limitation.  29 C.F.R. § 1630.2(j)(1)(i)-(v).  Based upon the ADAAA's plaintiff-friendly standard, then, and when drawing every reasonable inference in Gage's favor, a reasonable juror could find that Gage's migraine condition, when active and unmitigated, substantially limited her with respect to the major life activities of feeling, speaking and communicating.  I thus decline to grant Rymes' motion for summary judgment on this basis.[10]

    2.  <u>Discrimination Claims</u>

Rymes next contends that, even assuming that Gage had a qualifying disability, her disability discrimination claims fail because Rymes fired her for excessive unexcused absences rather than because she suffered from migraines.  Gage responds that

---

[10] In her initial objection to Rymes' motion for summary judgment, Gage argued that her June 12 migraine – standing alone, and without any evidence that she had previously experienced a similar event - was sufficiently severe to qualify as a disability.  At oral argument, however, Gage's counsel abandoned this argument.  I therefore need not consider whether that single episode, which produced serious symptoms for about six hours before Gage's symptoms "completely resolved," could qualify as a disability under the ADA and the ADAAA.

Rymes' proffered justification for her "demotion" and dismissal was a pretext for discrimination, and that she was actually "demoted" and fired because of her disability.[11]

In ADA cases that lack direct evidence of discriminatory motive, courts apply the familiar burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 24-25 (1st Cir. 2002).  Under this framework, the plaintiff must first establish a prima facie case of discrimination.  Duhy v. Concord Gen. Mut. Ins. Co., 2009 DNH 074, 14-15.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to provide a non-discriminatory reason for the adverse employment action.  Id.  If the employer satisfies this burden, the burden shifts back to the plaintiff to show that employer's stated reason for the adverse employment action was a pretext for discrimination.  Id.

Rymes contends that Gage cannot show that its proffered justification for moving and then firing her – namely, her

---

[11] Rymes also argues that Gage's move from the reception desk did not constitute an adverse employment action.  Doc. No. 12-1 at 9-10.  I need not resolve this issue here, however, in light of my ultimate conclusion that Gage's discrimination claim survives summary judgment.  Although I refer to this move as a "demotion" for the sake of brevity, I express no opinion regarding whether Gage's change in responsibilities constituted an adverse employment action.

failure to abide by the company's personal time policy - was a
pretext for discrimination.  There is no "mechanical formula for
finding pretext," and instead "it is the type of inquiry where
everything depends on the individual facts." Kelley v.
Correctional Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir.
2013) (citations and alterations omitted).  A plaintiff can show
pretext in a variety of ways, including through "evidence of
differential treatment in the workplace, statistical evidence
showing disparate treatment, temporal proximity of an employee's
protected activity to an employer's adverse action, and comments
by the employer which intimate a retaliatory mindset." Mesnick
v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (internal
citations omitted); see Bellerose v. SAU No. 39, 2014 DNH 265,
16.  Finally, the First Circuit has cautioned courts to be
"particularly cautious about granting the employer's motion for
summary judgment" in cases where "the issue becomes whether the
employer's stated nondiscriminatory reason is a pretext for
discrimination." Kelley, 707 F.3d at 115-16.

    Here too, Gage has produced minimally sufficient evidence
to support her claim that Rymes' proffered reason for firing her
was a pretext for unlawful disability discrimination.  That
evidence includes Enright's instant message exchanges regarding
Gage's headaches, and her deposition testimony that Gage was
moved from the reception desk after June 12, 2013 in part

because she "constantly had migraines, and . . . was never there to help walk in customers."  Doc. No. 14-7 at 9.  Viewed generously, these statements suggest that Gage's supervisors were aware of her migraine condition, and believed that her condition adversely affected her job performance.  These remarks are particularly helpful to Gage's claim given Enright's role in the discussion that led to Gage's termination, and the close temporal connection between the conversations, Gage's change in responsibilities, and her June 25 firing.  See Kelley, 707 F.3d at 117 ("One well-established method of demonstrating pretext is to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.") (citations and internal punctuation omitted).  Thus, viewed in the light most favorable to Gage, there is sufficient record evidence that Rymes' proffered reason for firing her was a pretext for discrimination.

   3.   Accommodation Claims

   Although Gage has presented minimally sufficient disability discrimination claims, Rymes is entitled to summary judgment on Gage's accommodation claims.  See Doc. No. 12-1 at 14-15.

   Gage contends that, because she disclosed that she was absent from work on June 12, 2013 due to "stroke-like symptoms," Rymes was obligated to allow her a one-day leave of absence as an accommodation for her disability.  Doc. No. 14-1 at 22-24.

24

She also appears to argue that Rymes violated the ADA by failing to initiate an interactive dialogue with Gage to address her potential need for an accommodation.  Id. at 22-23.  In response, Rymes argues that Gage's disclosure was insufficient to trigger any duty to accommodate.

An employer must make reasonable accommodations for an employee's known disability.  See 42 U.S.C. § 12112(b)(5)(A). In assessing whether a proposed accommodation is "reasonable," federal regulations provide that "it may be necessary for [an employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3).  According to EEOC interpretive guidance, an employer's duty to engage in interactive process is triggered "[o]nce an individual with a disability has requested provision of a reasonable accommodation."  29 C.F.R. pt. 1630, app. § 1630.9.

In the First Circuit, "[a] plaintiff must explicitly request an accommodation, unless the employer knew one was needed."  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012).  Thus, "[a]n accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability."  Id.  "This means not only notice of a condition, but of a causal connection between the major life activity that is limited and the

25

accommodation sought." Id. (internal quotation marks omitted).
Typically, the ADA's reasonable accommodation requirement is not
triggered until the employee makes such a request "[b]ecause an
employee's disability and concomitant need for an accommodation
are often not known to the employer until the employee requests
an accommodation." Reed v. LePage Bakeries, Inc., 244 F.3d 254,
261 (1st Cir. 2001).

Here, Gage has presented insufficient evidence to support a
viable accommodation claim.  First, Gage concedes that she never
actually requested an accommodation.  See Doc. No. 14-2 at 5.
Second, even viewing the evidence in the light most favorable to
Gage, she has not adequately shown that Rymes knew of her
alleged need for an accommodation following her June 12
hospitalization.  Instead, the record shows that, upon returning
to work on June 13, Gage told co-workers that she had missed
work on June 12 because of a TIA or "stroke."  When Enright
asked about Gage's condition on June 13, Gage said that she had
suffered a "transient [i]schemic attack (mini stroke)," but said
that she was "alright though, just have to have an MRA and stuff
done."  Doc. No. 14-7 at 36.  Thus, in describing the June 12
episode, Gage gave no indication that her hospitalization was
connected with her migraine condition.  She likewise did not
suggest that she had ever experienced a TIA before, or that she
might experience a similar condition in the future.  Under these

26

circumstances, Gage's disclosure was insufficient to trigger any duty to engage in interactive process or accommodate her disability.  Accordingly, her accommodation claim fails as a matter of law.

**B.   <u>Wrongful Discharge Claim</u>**

Gage finally alleges that she was wrongfully discharged in violation of New Hampshire law, specifically contending that she was fired "with bad faith and malice, in retaliation against her for performing acts encouraged by public policy, including seeking necessary medical treatment at an emergency room and staying home when instructed to do so by her doctors."  Doc. No. 1 at 6.  Rymes moves for summary judgment, arguing both that Gage's firing was a product of her absenteeism, not bad faith, retaliation, or malice, and that New Hampshire law does not recognize taking sick time as an actionable public policy. Under the facts of this case, Rymes' second argument is persuasive, and entitles it to summary judgment on Count III.

To make out a viable wrongful discharge claim under New Hampshire law, a plaintiff must show that (1) her termination was motivated by bad faith, retaliation or malice; and (2) that she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn.  Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248 (2006).  Thus, "[t]he first prong focuses on the nature

of the employer's actions, while the public policy prong
pertains to the employee's acts." Duhy, 2009 DNH 074, 27
(citations and punctuation omitted).  "[O]rdinarily the issue of
whether a public policy exists is a question for the jury, [but]
at times the presence or absence of such a public policy is so
clear that a court may rule on its existence as a matter of
law." Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992)
(citations and punctuation omitted).  This is one of those
times.

Gage claims that she was fired for engaging (or refusing to
engage) in three actions that implicate public policy.  She
principally argues that public policy encourages an employee to
take time off from work when seriously ill.  In the alternative,
she argues that public policy encourages "a person suffering
from stroke-like symptoms to seek emergency medical treatment,"
and "discourage[s] such a person from getting behind the wheel
and driving to work, endangering herself and others."  Doc. No.
14-1 at 25; see Doc. No. 20 at 5.  I address, and ultimately
reject, each argument in turn.[12]

---

[12] Gage does not appear to base her wrongful discharge claim on an
argument that firing a disabled person violates public policy.
To the extent that she is making that argument, her argument
fails as a matter of law.  The second element of a wrongful
discharge claim "focus[es] on the acts of the employee and on
their relationship to public policy, not on the mere
articulation of a policy by the employee."  Frechette v. Wal-
Mart Stores, Inc., 925 F. Supp. 95, 98 (D.N.H. 1995).

As a preliminary matter, I recognize that there may be circumstances in which public policy would encourage an employee to take sick time.  See Duhy, 2009 DNH 074, 29-30.  Barring unusual circumstances not present here (i.e. a highly contagious and life threatening illness), however, public policy only encourages such conduct where the employee has some enforceable right to take sick time.  Thus, public policy may encourage an employee to take sick time where the employee has a contractual right to sick time under her employment agreement.  But cf. Gavin v. Liberty Mut. Group Inc., 2012 DNH 154, 18-20 (rejecting argument that public policy encourages employees to take sick leave pursuant to the employer's "flexible time off" policy); Duhy, 2009 DNH 074, 29 (rejecting "as a broad proposition, [that] public policy encourages employees to take vacation days or file health insurance claims through the policy offered by their employer").  Public policy may also encourage an employee to use sick time that she is entitled to take under state or

---

Accordingly, "[a] condition that is protected by public policy, such as sickness, disability, and age, as distinguished from acts by the employee that are protected by public policy, does not satisfy the second element of a wrongful discharge claim." Schomburg v. Dell, Inc., 2006 WL 2864048 (D.N.H. Oct. 4, 2006) (emphasis in original). Indeed, "the New Hampshire Supreme Court has made clear [that] the common law cause of action for wrongful discharge is not the proper means by which to remedy a discharge that was motivated by someone's status or physical condition." Parker v. MVM, Inc., 2006 DNH 070, 6. Thus, to the extent that Gage bases her wrongful discharge claim upon her status as a disabled person, her claim fails.

federal law.  For example, if an employee is entitled to sick time as an accommodation for her disability pursuant to the ADA, and the employer fires the employee for taking that leave, the employee might be able to make out a viable wrongful discharge claim.  See Faulkner v. Mary Hitchcock Mem'l Hosp., 2013 DNH 152 (rejecting argument that Section 354-A preempts wrongful discharge claim based upon employer's alleged failure to accommodate employee's disability).

Here, however, Gage had neither a contractual right to sick time nor a statutory right to miss work on June 12.  According to Rymes' leave policy, employees are entitled to eight hours of unpaid personal time per year, and accrue paid vacation and personal time (after a ninety-day probationary period) on a weekly basis.  See Doc. No. 12-3.  If an employee misses work without first accruing sufficient personal time, that employee is subject to immediate termination.  Yet, when Gage missed work on June 12, 2013, she did not have enough leave time accrued to cover that absence.  In fact, she had fourteen absences in excess of her accrued time before June 12, none of which were due to her claimed disability.  Doc. No. 12-5 at 2.  She likewise had no statutory right to miss work that day.  As explained above, Gage had no right to a reasonable accommodation

pursuant to the ADA or Section 354-A.[13]  Accordingly, the absence of Gage's proffered public policy is sufficiently clear that I may reject her claim as a matter of law.

Gage's alternative public policy arguments are more easily dispatched.  Without providing legal authority or other support, Gage contends that public policy "would encourage a person suffering stroke-like symptoms to seek emergency medical treatment" and "would also discourage such a person from getting behind the wheel and driving to work, endangering herself and others."  Doc. No. 14-1 at 25.  Even assuming that public policy encourages individuals to seek necessary medical care and discourages impaired driving, Gage has presented no evidence that she was actually fired for such conduct.  Instead, the record at most shows that she was fired for taking an unauthorized absence from work on June 12.  And, as explained above, that conduct cannot form the basis of a viable wrongful discharge claim under the facts of this case.

## IV.   CONCLUSION

For the reasons set forth above, Rymes' motion for summary judgment (Doc. No. 12) is granted in part and denied in part as to Count I and Count II, and granted as to Count III.  The only

---

[13] Gage also has not argued that she was entitled to take sick leave under the Family and Medical Leave Act.

claims that remain are Gage's claims that she was discriminated against because of her disability in violation of state and federal law.

SO ORDERED.


                                    /s/ Paul Barbadoro
                                    Paul Barbadoro
                                    United States District Judge


March 1, 2016

cc:   Benjamin T. King, Esq.
      David W. McGrath, Esq.
      Courtney H.G. Herz, Esq.